959 A.2d 778

**Linwood BEAN**

v.

**DEPARTMENT OF HEALTH AND MENTAL HYGIENE, et al.**

**No. 7, Sept. Term, 2008.**

Court of Appeals of Maryland.

Nov. 5, 2008.

420

George E. Burns, Jr., Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for petitioner.

Kathleen A. Ellis, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., David E. Wagner, Staff Atty., on brief), for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, JOHN C. ELDRIDGE, (Retired, specially assigned), IRMA S. RAKER, (Retired, specially assigned) and ALAN M. WILNER, (Retired, specially assigned) JJ.

HARRELL, J.

The issue presented in this case is whether, in a release eligibility proceeding under Maryland Code, Criminal Proce-

dure Article, §§ 3–114 and 3–119 (2006), a person committed to the Department of Health and Mental Hygiene, pursuant to a finding of not criminally responsible, is required as a matter of law to produce expert medical testimony in order to meet his or her evidentiary burden of proving he or she would not be a danger due to a mental disorder or mental retardation if released. The Circuit Court for Baltimore City determined, in granting conditional release to Linwood Bean, that Bean did not have to produce expert testimony to meet his evidentiary burden under the circumstances of his case. The Court of Special Appeals reversed, concluding that, in all such cases, the issue of whether a person would pose a danger to himself or others if released from confinement presents a complicated medical question that may be resolved only by weighing competing relevant expert testimony. For reasons to be explained, we shall reverse the judgment of the Court of Special Appeals and remand with directions to affirm the judgment of the Circuit Court.

## I.

## Background

On 3 December 1985, Linwood Bean was found not criminally responsible of a charge of assault with intent to murder [1]. He was committed to the Department of Health and Mental Hygiene ("Department") for inpatient care and treatment. Bean thereafter was released conditionally from inpatient treatment, after his commitment in 1985, on three different

---

**1.** The statutory provision in 1985 governing a finding of not criminally responsible, Maryland Code, Health General Article, § 12–108, is recodified, without substantive change, today as Maryland Code, Criminal Procedure Article, § 3–109, effective 1 October 2001, and provides:

(a) In general.—A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity to:

(1) appreciate the criminality of that conduct; or

(2) conform that conduct to the requirements of law.

(b) Exclusions.—For the purposes of this section, "mental disorder" does not include an abnormality that is manifested only by repeated criminal or otherwise antisocial conduct.

occasions, the most recent of which was revoked on 15 October 2001 due to allegations that he assaulted his landlady. Since then, Bean has been a patient at the Clifton T. Perkins Hospital Center.

On 23 December 2004, pursuant to § 3–119 of the Criminal Procedure Article, Bean filed a petition with the Circuit Court for Baltimore City requesting conditional release or discharge from his inpatient commitment to the Department.[2]  A jury

---

**2.**  Maryland Code, Criminal Procedure Article, § 3–119 provides:
(a) In general.—(1)  Not earlier than 1 year after the initial release hearing ends or was waived, and not more than once a year thereafter, a committed person may apply for release under either subsection (b) or (c) of this section, but not both.
(2) Notwithstanding the time restrictions in paragraph (1) of this subsection, a committed person may file an application for release at any time if the application is accompanied by an affidavit of a physician or licensed psychologist that states an improvement in the mental condition of the committed person since the last hearing.
(b) Administrative procedure.—(1)  To apply for release under this subsection, the committed person shall file an application for release with the Health Department and notify the court and State's Attorney, in writing, of this request.
(2) The provisions of this title governing administrative hearing and judicial determination of eligibility for release apply to any application for release under this subsection.
(c) Court procedure.—(1)  To apply for release under this subsection, the committed person shall file a petition for release with the court that ordered commitment.
(2) The committed person shall send a copy of the petition for release to the Health Department and the State's Attorney.
(3) If the committed person requests a trial by jury, the trial shall be held in a circuit court with a jury as in a civil action at law.
(4) The trier of fact shall:
(i) determine whether the committed person has proved eligibility for release by a preponderance of the evidence;  and
(ii) render a verdict for:
1.  continued commitment;
2.  conditional release;  or
3.  discharge from commitment.
(5) If the trier of fact renders a verdict for conditional release, within 30 days after the verdict, the court shall release the committed person under conditions it imposes in accordance with specific recommendations for conditions under § 3–116(b) of this title.
(d) Appeals.—(1) An appeal from a District Court order shall be on the record in the circuit court.
(2) An appeal from a circuit court order shall be by application for leave to appeal to the Court of Special Appeals.

trial was held on 20 June 2006 to determine whether Bean was eligible for conditional release or discharge.

During the trial, Bean presented, as his case-in-chief, testimony from two witnesses: himself and a friend, Andrew Conwell. Neither Bean nor Conwell was offered as an expert; indeed, neither is a physician, psychiatrist, psychologist, licensed clinical social worker, or other mental health or medical professional. Bean, for his part, acknowledged that he has a mental disorder, but that, in his opinion, his release would not pose any danger to himself or others as a result of the disorder because he would continue to take the required medicine and because he would have the proper support system for his reintegration into the community.[3] Conwell

---

**3.** The pertinent exchange between Bean and his counsel with regard to Bean's acknowledgment of his disorder and his willingness to comply with required medicinal treatment was as follows:

"Q: Have you ever struck out at the staff, punched them, tried to stomp on them, or try to hurt them in any way?
A: No I have not.
Q: Well why not? You have a mental disorder don't you?
A: Of course I do.
Q: Well, what's your mental disorder? You heard Counsel use a big word for it. What does it mean to you? What's your mental disorder?
A: My mental disorder is schizophrenic.
Q: Well what does that mean?
A: Schizophrenic, it means your thinking is (inaudible). It means that you don't think right directly to your aptitude where you should normally speak. If you speak directly—see, I'm a Gemini and they say Gemini is a schizo anyway.
Q: But you are a schizo.
A: Yes.
Q: You have a mental disorder, right?
A: Yes sir.
Q: And you don't know what caused it, right?
A: No sir.
Q: But it's the way you are, it's the way your head is wired isn't it?
A: Right.
. . .
Q: Well let me ask you something. In terms of your taking medication, if you were released with conditions and this jury found that you should be released with conditions and His Honor ordered you to take medication, would you take it?
A: Of course.
Q: Why would you take it?

A: Because Your Honor has his right to adjust the justification that I should take—

Q: He has the power and right to tell you to take it?

A: The power to do it, right.

Q: Well, if you got these tremors and you felt that you didn't want to take it anymore, would you violate his authority to take it?

A: No I would not.

Q: Well why not?

A: Because [he] has the right and alternative to say that I have to take medication. It's his right.

Q: Let me ask you something. In terms of any plan that you might have if these folks decide to release you conditionally, where would you stay?

A: Well, I had plans to stay at a woman's house, Ms. Ella Barnes. And she lives on Reisterstown Road, she said she has a house waiting for me when I do get released. And (inaudible) room—

Q: Is that a place where other people with your [ ] circumstances have?

A: Yes sir it is, it is. And they have the ability to know what time to make medications, what time not to take medications.

Q: Did you yourself set that up to take the medications if you are released?

A: Yes I did.

Q: Did the hospital have anything to do with that?

A: No they did not.

Q: Well why did you set that up if you really don't want to take these medications? Why would you go out and belabor to try and do that? Did you want to look good to these people here today?

A: No, it's because that if I'm not enabled to take medication, what am I able to do? Since they call it a mental illness.

Q: So you recognize that you have to take medications for your mental illness, correct?

A: Yes, yes.

Q: Even though you don't like what it does to you.

A: Right."

Bean and his counsel also explored his possible re-entry into the community:

"Q: Do you believe that you can be released by this jury into the community without conditions and successfully integrate yourself into the community?

A: Yes I do.

Q: And what do you base that opinion, that lay opinion, on?

A: On cooperation.

Q: And what do you mean by 'cooperation'?

A: Cooperation in the hope that if I have nothing else to do with any individual out there that has nothing to do with me implying that I have nothing preponderance in their discretion, if I had to agree with what they say do, then I'm going to agree with what they say. I'm do what I'm supposed to do on my time.

Q: Well who would you rely on? Since you have no family, who would you re[ ]ly on to give you kind of a network of support?

A: I would rely on Mr. Andrew Conwell.

testified that he has known Bean since 1965; employed Bean as a contractor without any problems during the earlier occasions Bean was released conditionally; had further daily interaction with Bean without problems during Bean's previous releases; and that, based on these experiences, Bean should be considered eligible for release.

At the close of Bean's case-in-chief, the Department moved for judgment on the ground that Bean, who had the burden of proof, failed to present any expert testimony as to whether his mental disorder would render him a danger to himself or the person or property of others if he were to be released from commitment, with or without conditions. The trial judge denied the Department's motion.

In its case-in-chief, the Department adduced the testimony of Lisa Sloat, M.D., a psychiatrist at Perkins Hospital. After qualifying as an expert in forensic psychiatry, Dr. Sloat testified that her diagnosis for Bean is Schizoaffective Disorder [4],

---

Q: Your friend Buddy Conwell. Well, why would you rely on him?
A: Because he has set me up with jobs, opportunities to do things that I am to show myself how to be more successful than other people could do. Because he showed me how to work his work, he showed me how to (inaudible) go over his background where I should be in his background with his family."

**4.** Schizoaffective Disorder has been defined by the American Psychiatric Association as "[a] depressive or manic *syndrome* that precedes or develops concurrently with *psychotic* symptoms incompatible with an affective disorder. Includes some *symptoms* characteristic of *schizophrenia* and other symptoms seen in *major affective disorders*." Am. Psychiatric Ass'n, a Psychiatric Glossary (Arnold Werner et al. eds., 5th ed.1980) (emphasis in original). The "Diagnostic criteria" for the disorder is described as:

A. An uninterrupted period of illness during which, at some time, there is either a Major Depressive Episode, a Manic Episode, or a Mixed Episode concurrent with symptoms that meet Criterion A for Schizophrenia.
[Note:] The Major Depressive Episode must include Criterion A1: depressed mood.
B. During the same period of illness, there have been delusions or hallucinations for at least 2 weeks in the absence of prominent mood symptoms.

and that, because of that mental disorder, Bean would be a danger to himself and to others if he were released, with or without conditions, from inpatient treatment.[5]   According to her, due to Bean's lack of insight into his mental disorder, there was little assurance that his violent past behaviors would not be repeated.   Dr. Sloat also testified that, in her opinion, Bean likely would not be able to control his behavior if or when his symptoms returned.   Dr. Sloat's testimony, however, suggested that, although Bean had a history of mental disorder and physically disruptive behavior, the medicinal treatments he received under professional supervision had more or less caused his symptoms to subside and improved his behavior.[6]

---

C.   Symptoms that meet criteria for a mood episode are present for a substantial portion of the total duration of the active and residual periods of the illness.

D.   The disturbance is not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition.

AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 323 (4th ed.2000).

5.   The pertinent exchange between counsel for the Department and Dr. Sloat with regard to her professional opinion of Bean's disorder was as follows:

"Q:   Have you formed an opinion to a reasonable degree of medical certainty as to whether Mr. Bean, as a result of his mental disorder, would be a danger to himself or others if released from inpatient treatment with or without conditions?

A:   Yes.

Q:   What is your opinion?

A:   He would be a danger to himself or others if he were released with or without conditions.

Q:   And can you explain how you've reached that opinion?

A:   Mr. Bean has a mental disorder.   And he does not believe that he has a mental disorder, although he said yes when [his counsel] asked him, he wasn't able to tell what any of his symptoms are.   When he was asked w[hat] a delusion was, hallucination, he didn't know.   And this is something that I go over with Mr. Bean every time I meet with him."

6.   On direct examination, Dr. Sloat testified:

"Q:   How about his behavior at the hospital?

A:   What about?

Q:   Have there been concerns about his behavior?

At the close of all the evidence, the Department renewed its motion for judgment on the same ground as its earlier motion—Bean's failure to produce expert testimony. The Circuit Court denied the motion, and submitted the case to the jury. The jury determined that Bean should be released from inpatient commitment, with conditions. On 26 July 2006, the Court entered an Order for Conditional Release.

On 27 July 2006, pursuant to § 3–119(d)(2) of the Criminal Procedure Article, the Department filed an Application for Leave to Appeal. The Department concurrently moved in the Circuit Court for a Stay Pending Appeal. The Circuit Court denied the stay request. The Department then filed a Motion for Stay Pending Appeal, pursuant to Maryland Rule 8–425, with the Court of Special Appeals. The Court of Special Appeals granted the Department's Application and the Motion

---

A: Well, yes. That's why we had [to] panel him because of his behavior. His arguments with patients, with people, his roommates. Someone had just redone the bulletin board, another patient on the ward, and Mr. Bean was writing all over it and the other patient was getting really angry and was threatening to assault Mr. Bean. So there's been a lot of things—

Q: What do you attribute that to?

A: He was not taking his medication. He was writing bizarre things and drawings on the bulletin boards.

Q: Would you discuss the history of compliance in general of the last—

A: Over the last, I'd say 30 years, he's refused to take medications on and off in the hospital and out of the hospital. And when he's been out of the hospital, when he stops taking his medications, is when it leads to someone getting hurt.

. . .

Q: Could you summarize for us why you believe Mr. Bean needs to stay in the hospital?

A: Because I don't think that he understands his mental illness, he doesn't understand what his symptoms are, what his pa[s]t symptoms have been. He doesn't realize when he's having symptoms, he doesn't think he needs medication. He won't take the medication that we tell him that he should take in the hospital, I don't believe he'll take the medication out of the hospital. In the past when he has been released from the hospital on conditional releases, and it's specifically stated you need to take your medication, you need to do this, you need to do that. He hasn't done it, even though the judge told him that he had to. I don't think that he would comply and I think that he would become dangerous."

for Stay Pending Appeal. In a reported opinion, *Dep't of Health & Mental Hygiene v. Bean,* 178 Md.App. 418, 941 A.2d 1232 (2008), the intermediate appellate court reversed the Circuit Court's judgment on the ground that a committed person must produce expert testimony or evidence to satisfy his/her burden of proof with regard to eligibility for release. We granted Bean's petition for a writ of certiorari.[7] *Bean v. Dep't of Health,* 404 Md. 152, 945 A.2d 1271 (2008). We shall reverse the judgment of the Court of Special Appeals.

## II.

## Discussion

### A.

Maryland Code, Criminal Procedure Article, § 3–114 provides:

(a) In general.—A committed person may be released under the provisions of this section and §§ 3–115 though 3–122 of this title.

(b) Discharge.—A committed person is eligible for discharge from commitment only if that person would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if discharged.

(c) Conditional Release.—A committed person is eligible for conditional release from commitment only if that person would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if released from confinement with conditions imposed by the court.

(d) Burden of proof.—To be released, a committed person has the burden to establish by a preponderance of the evidence eligibility for discharge or eligibility for conditional release.

---

7. The successful petition for certiorari framed the following question: Did the Court of Special Appeals err in holding that a committee cannot gain release pursuant to Criminal Procedure Article § 3–114 without producing his own expert witness?

As noted *supra* at 2–3, n. 2, the procedure by which a committed person may apply to a court for release is found in subsection (c) of § 3–119, and provides:

(c) Court procedure.—(1)  To apply for release under this subsection, the committed person shall file a petition for release with the court that ordered commitment.

(2) The committed person shall send a copy of the petition for release to the Health Department and the State's Attorney.

(3) If the committed person requests a trial by jury, the trial shall be held in a circuit court with a jury as in a civil action at law.

(4) The trier of fact shall:

(i) determine whether the committed person has proved eligibility for release by a preponderance of the evidence; and

(ii)  render a verdict for:

1.   continued commitment;

2.   conditional release; or

3.   discharge from commitment.

(5) If the trier of fact renders a verdict for conditional release, within 30 days after the verdict, the court shall release the committed person under conditions it imposes in accordance with specific recommendations for conditions under § 3–116(b) of this title.

In its opinion in the present case, the Court of Special Appeals held that "[t]o generate a jury issue on the question of whether he was entitled to a conditional release, [Bean] had the burden of producing expert testimony that he would not pose a danger if released from the hospital." *Dep't of Health & Mental Hygiene v. Bean,* 178 Md.App. at 427, 941 A.2d at 1238. Thus, according to the intermediate appellate court, although the statutory procedure provides for the trier of fact, in many cases a jury, to determine whether a committed person is eligible for release based on the evidence presented, a prima facie case supporting eligibility for release that may

go to the fact-finder on the merits will not exist, absent an expert opinion supporting such eligibility. In light of the statutory scheme in §§ 3–114 through 3–122 of the Criminal Procedure Article and relevant case law, we disagree with the Court of Special Appeals's recognition of such a threshold requirement in all cases and specifically on the record in this case.

## B.

Title 3 of the Criminal Procedure Article provides for the standards and procedures for determining competency and criminal responsibility in criminal cases. Title 3, specifically §§ 3–101 through 3–123, provides certain standards, such as "not criminally responsible" [8] and "incompetent to stand trial," [9] that are to be determined based on the presentation of evidence. A review of the whole of Title 3 reveals that in not one section is there any legislative mandate or directive that the courts must receive and consider expert medical opinion in making these determinations in each and every case, including

---

8. As noted previously, § 3–109 provides:
   (a) In general.—A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity to:
   (1) appreciate the criminality of that conduct; or
   (2) conform that conduct to the requirements of law.
   (b) Exclusions.—For purposes of this section, "mental disorder" does not include an abnormality that is manifested only by repeated criminal or otherwise antisocial conduct.

9. Section 3–104 provides:
   (a) In general.—If, before or during a trial, the defendant in a criminal case or a violation of probation proceeding appears to the court to be incompetent to stand trial or the defendant alleges incompetence to stand trial, the court shall determine, on evidence presented on the record, whether the defendant is incompetent to stand trial.
   (b) Court action if defendant found competent.—If, after receiving evidence, the court finds that the defendant is competent to stand trial, the trial shall begin as soon as practicable or, if already begun, shall continue.
   (c) Reconsideration.—At any time before final judgment, the court may reconsider the question of whether the defendant is incompetent to stand trial.

eligibility for release determinations. Maryland Code, Criminal Procedure Article, § 3–114. It would seem that the necessity for such evidence was left by the Legislature to be determined on the facts of each case.

■ In the present case, the evidence presented in the parties' cases-in-chief at trial revealed that Bean and the Department were in agreement on two major points: Bean has a mental disorder, and the symptoms and potentially troubling behavior Bean exhibits as a result of that disorder more or less can be controlled by his taking prescribed medication. The main factual dispute presented to the jury to resolve was whether Bean would continue to take the prescribed medications if released conditionally.

■ As indicated *supra*, § 3–114 provides that a committed person is eligible for conditional release "only if that person would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if released from confinement with conditions imposed by the court." Because Bean acknowledged that he has a specific mental disorder and the Department conceded that the disorder may be managed with medication, the material issue contested before the jury was the factual dispute over whether Bean would take the necessary medications if granted a conditional release. Consistent with Maryland case law holding that expert medical opinion is required only "when the subject of the inference [presented to the jury] is so particularly related to some science or profession that it is beyond the ken of the average layman" and is not required "on matters of which the jurors would be aware by virtue of common knowledge," *CIGNA Prop. & Cas. Cos. v. Zeitler*, 126 Md.App. 444, 463, 730 A.2d 248, 259–60 (1999) (quoting *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 109 Md.App. 217, 257, 674 A.2d 106, 125–26 (1996), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997)), Bean did not need to present expert medical opinion in support of his desired relief because the principal dispute that needed to be resolved by the jury in this case did not present a complex medical issue,

but rather depended on resolving a factual dispute, dependent to a great extent on a credibility assessment of Bean's testimony, a matter within a jury's ken. *See Wilhelm v. State Traffic Safety Comm'n*, 230 Md. 91, 99, 185 A.2d 715, 719 (1962) ("There are, unquestionably, many occasions where the causal connection between a defendant's negligence and a disability claimed by a plaintiff does not need to be established by expert testimony. Particularly this is true when the disability develops coincidentally with, or within a reasonable time after, the negligent act, or where the causal connection is clearly apparent from the illness itself and the circumstances surrounding it, or where the cause of the injury relates to matters of common experience, knowledge, or observation of laymen."); *Fink v. Steele*, 166 Md. 354, 361, 171 A. 49, 52 (1934) (noting that in malpractice cases against physicians and surgeons, "[t]here may be cases in which there is such gross negligence and unskillfulness as to dispense with professional witnesses"); *CIGNA Prop. & Cas. Cos.*, 126 Md.App. at 469, 730 A.2d at 261 (noting that "the duty to render a professional judgment regarding a subrogation clause in a commercial lease is beyond the ken of the average juror," whereas "[i]n contrast, the issue concerning the duty to inform a client that the coverage actually obtained differs from what was sought is, ordinarily, not beyond the understanding of the average juror").

■ Whether Bean would take the necessary medications as prescribed, the penultimate issue to be decided by jury in this case, was a factual one quintessentially for the jury to resolve. Bean and Conwell testified as to Bean's positive behavior upon his previous releases and his willingness to comply with court or hospital-imposed coping programs and medicines. The Department countered, as it would in the overwhelming majority of § 3–119 release proceedings, with an expert witness, such as Dr. Sloat, in this case, who testified as to a lack of faith in Bean's likelihood of compliance with the programs and medications were he to be released conditionally. She bolstered her opinion with observations regarding Bean's prior failures to take his medications faithfully and the

resultant relapses in behavior. The jury had the opportunity to judge the credibility of the witnesses and to determine whether Bean proved his eligibility to its satisfaction. The jury determined that Bean satisfied his burden of proof to obtain a conditional release. "In a jury case in which there is legally sufficient evidence to support the jury verdict, the Court will not inquire into the weight of the evidence." *Gray v. Director, Patuxent Inst.*, 245 Md. 80, 84, 224 A.2d 879, 881 (1966).[10]

### III.

■ Respondent, alternatively, argues that in all § 3–119 release eligibility proceedings the committed person must present expert medical opinion in his/her favor because the issue of whether the committed person would pose a danger presents a complicated medical issue which, at common law, requires expert opinion evidence. Respondent urges this Court to conclude that the Court of Special Appeals followed "firmly established common law" in characterizing proof of a lack of dangerousness as a complicated medical question, necessarily requiring the presentation of expert testimony. We reject this categorical argument and determine rather that the lack of dangerousness issue does not present always a complicated medical question necessarily requiring the presentation of expert testimony. Whether expert testimony is required to be adduced by a committed person will depend on the nature of the disputed issues in the proceeding and therefore must be approached on a case-by-case basis.

### A.

In support of its analysis, the Court of Special Appeals relied on the proposition that "reliance on lay testimony alone

---

10. Although our holding is that expert testimony from Bean was not required, as a matter of law, in order for him to sustain his burden of proof where the issue of dangerousness was essentially a factual one, nonetheless, where the disputed issue has a medical overlay expert testimony from either side is not rendered inadmissible. Our holding addresses legal sufficiency, not admissibility.

is not justified when the medical question involved is a complicated one, involving fact finding which properly falls within the province of medical experts," taken from this Court's decision in *Jewel Tea Co. v. Blamble*, 227 Md. 1, 7, 174 A.2d 764, 767 (1961), in support of the conclusion that favorable expert medical opinion is required always of applicants in release eligibility proceedings if the applicants hope to prevail. In placing unrestrained reliance on this observation, the Court of Special Appeals erred in two respects. First, close examination of *Jewel Tea Co.* indicates that this Court did not apply the quoted proposition to the issue at hand in that case. Second, in Maryland and other jurisdictions, courts have concluded that the determination of whether a committed person poses a danger if not confined is not necessarily the type of complicated medical question that only may be resolved through the consideration of dueling expert testimony.

i.

In *Jewel Tea Co. v. Blamble*, 227 Md. 1, 174 A.2d 764, we considered whether the plaintiff presented sufficient evidence to prove that her injuries constituted "total disability," meaning "incapacity to do work of *any* kind, and not mere incapacity to perform that work which the employee was accustomed and qualified to perform before the injury." *Jewel Tea Co.*, 227 Md. at 3, 174 A.2d at 765 (emphasis in original). In support of her position that her on-the-job injuries caused her "total disability," the plaintiff presented expert medical testimony and the lay opinion of herself and her landlady. The only medical testimony presented at trial was by the plaintiff's attending physician, who testified that, in his opinion, although the plaintiff suffered severe injuries, she could work at a sit-down job for three to four hours a day, with rest periods. *Jewel Tea Co.*, 227 Md. at 5, 174 A.2d at 766. The plaintiff testified that, largely due to certain subjective physical feelings, she felt she could not go back to work. *Jewel Tea Co.*, 227 Md. at 4, 174 A.2d at 766. As the *Jewel* Court noted, she based "her conclusion not upon any attempt she has made to work but only on her own personal feelings and certain

experiences around the house and in a department store...."
*Jewel Tea Co.,* 227 Md. at 4–5, 174 A.2d at 766.

We held that the plaintiff failed to present sufficient evidence to warrant submission to the jury of the question of permanent total disability. *Jewel Tea Co.,* 227 Md. at 8, 174 A.2d at 768. The holding was premised not on the fact that the expert and lay opinions conflicted, but because the plaintiff's testimony was grounded in conjecture or possibility. As the Court noted:

> In the absence of more compelling proof than the opinion of the employee herself and that of her landlady that she is totally disabled within the intendment of the statute, and in the light of medical opinion to the contrary, we must hold that the trial court erred in refusing to grant the appellant's prayer.

*Jewel Tea Co.,* 227 Md. at 8, 174 A.2d at 768. Had the plaintiff presented evidence beyond her subjective feelings about the future, her claim of permanency and total disability might have been sufficient to submit the case to the jury for a verdict, despite having presented conflicting expert medical opinion or even no expert medical opinion at all. *See Jewel Tea Co.,* 227 Md. at 7, 174 A.2d at 767 ("It is obvious that in cases such as the one before us the experience and information secured by medical experts concerning the type, degree, extent and duration of disability attendant upon the disease involved here, and the superimposing of their findings upon the general physical and mental condition of the patient, are invaluable. In the instant case such expert testimony was in fact, in our opinion, determinative, in contradistinction to the testimony of the lay witnesses, which, from the nature of this case, could only be conjectural."). Thus, the Court explicitly acknowledged "[w]hat we have said should not be taken as indicating that we conclude that all awards in cases of injuries of a subjective nature can stand only if accompanied by definitive medical testimony, as the appellant suggests." *Jewel Tea Co.,* 227 Md. at 7, 174 A.2d at 767.

ii.

■ A holding in the present case that whether a committed person poses a danger if released always presents a complicated medical issue requiring expert testimony would contradict parallel or analogous Maryland and Supreme Court authorities holding that there is no absolute requirement that such testimony be present in order to make such a determination. In *Hill v. State,* 35 Md.App. 98, 369 A.2d 98 (1977), the Court of Special Appeals addressed the need for expert medical opinion in the context of those instances in which a defendant pleads before the trial court that he or she is incompetent to stand trial. The appellate court expressly overruled dicta in an earlier case, holding:

> There is no doubt that the issue of competency to stand trial in many cases may involve a necessity for the trial judge to have or indeed, perhaps to seek, the testimony of medically trained psychiatrists before making a determination of competency. . . .

> [However, w]e find nothing in the statute to indicate that testimony by a medically trained psychiatrist that the accused is competent to stand trial is *necessarily required* before the court may make a determination of competency beyond a reasonable doubt. We did not intend the decision in *Colbert [v. State,* 18 Md.App. 632, 308 A.2d 726 (1973) ] to indicate otherwise.

*Hill,* 35 Md.App. at 108–10, 369 A.2d at 104–05. The court found this view to be consistent with federal case law on point, providing:

> This court recognizes that in making a competency determination it may be very useful for the trial judge to question both the defendant and his counsel; the applicable criteria measure one's ability to consult with his lawyer and to understand the course of legal proceedings. Thus counsel's first-hand evaluation of a defendant's ability to consult on his case and to understand the charges and proceedings against him may be as valuable as an expert psychiatric opinion on his competency.

*Hill,* 35 Md.App. at 110, 369 A.2d at 105 (quoting *United States v. David,* 511 F.2d 355, 360 (D.C.Cir.1975)). The competency situation is sufficiently analogous to the present issue because of the similarity of the evidence that typically may be evaluated in each situation. In both situations, both lay and expert medical opinion regarding behaviors and thought processes may be highly relevant to the determination, yet in neither case has the General Assembly required that expert medical opinion necessarily be presented. For the competency determination, the standard is whether the accused is able to understand the nature of the proceedings against him and to assist in his own defense, *Raithel v. State,* 280 Md. 291, 297, 372 A.2d 1069, 1072 (1977), a test that makes expert medical and lay opinion potentially highly relevant. *See Sangster v. State,* 70 Md.App. 456, 464–65, 521 A.2d 811, 815 (1987), *aff'd,* 312 Md. 560, 541 A.2d 637 (1988) ("In the case *sub judice,* appellant raised the issue of his competency to stand trial. He presented evidence from a psychiatrist . . . that he suffered from a chronic schizophrenic disorder and that because of this mental disorder he could neither understand the nature of the proceedings nor assist in his defense. The State called no witnesses in rebuttal, but apparently submitted a report from Clifton T. Perkins State Hospital in which it was concluded that the appellant was competent to stand trial.") (footnotes omitted). Likewise, the standard for release eligibility, persuading a fact-finder that one would not pose a danger as a result of mental disorder if discharged, makes lay and expert medical opinion potentially highly relevant, as demonstrated by the testimonies of Bean, Conwell, and Dr. Sloat in this case. Because expert opinion has been found not to be required absolutely in every competency determination, this Court is unwilling to embrace a per se rule, under § 3–119, that expert medical opinion necessarily must be presented in favor of committed persons in release eligibility proceedings in every case in order to submit the matter to the fact-finder.

In *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), *superseded on other grounds by* 28 U.S.C.A. § 2253(c)(2) (2008), discussed by both parties in their

briefs, the Supreme Court addressed a petitioner's contention that his Texas death sentence should be set aside on the ground that psychiatrists, as part of the Texas capital sentencing proceedings,[11] can not predict competently and within an acceptable degree of reliability that a particular criminal will commit other crimes and so represents a danger to the community. *Barefoot,* 463 U.S. at 896, 103 S.Ct. 3383. The Court rejected the petitioner's argument, finding that psychiatric testimony would be relevant and helpful to the jury in making its determination. *Barefoot,* 463 U.S. at 902–03, 103 S.Ct. 3383. In rejecting the petitioner's argument, the Court also acknowledged that, although expert medical opinion could be relevant and helpful, it by no means absolutely was required to show that an accused likely poses a danger to the community. The Court noted:

---

**11.** The psychiatrists were called to testify because one of the requirements under the relevant Texas statute was for the jury to determine the potential future dangerousness of the accused. At the time, Texas Code of Criminal Procedure § 37.071 provided:

(a) Upon a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment. The proceeding shall be conducted in the trial court before the trial jury as soon as practicable. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Texas. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.

(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

(c) The state must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of "yes" or "no" on each issue submitted.

*Although there was only lay testimony with respect to dangerousness in Jurek [v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)], there was no suggestion by the Court that the testimony of doctors would be inadmissible. To the contrary, the Court said that the jury should be presented with all of the relevant information.... [T]he rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the fact finder, who would have the benefit of cross examination and contrary evidence by the opposing party. Psychiatric testimony predicting dangerousness may be countered not only as erroneous in a particular case but as generally so unreliable that it should be ignored. *If the jury may make up its mind about future dangerousness unaided by psychiatric testimony,* jurors should not be barred from hearing the views of the State's psychiatrists along with opposing views of the defendant's doctors.

*Barefoot,* 463 U.S. at 897–99, 103 S.Ct. 3383 (emphasis added).

Respondent in the present case seeks to distinguish *Barefoot* on the ground that its holding is inapplicable here because the expert testimony in *Barefoot* was in the context of "predictions of the probability that a particular criminal defendant will commit additional crimes as part of a capital sentencing scheme," rather than in the context of the standards governing release eligibility proceedings. On this record, the distinction is unpersuasive. Proof of future dangerousness under the Texas capital punishment statute in *Barefoot* was not limited to mental or psychiatric causation, unlike the nature of a § 3–119 proceeding such as here. Nonetheless, because at Bean's specific proceeding the existence of his mental disease or condition was conceded, effectively his § 3–119 action was on the same conceptual footing as the statute in play in *Barefoot.* Thus, in the capital sentencing scheme in Texas, expert opinion bearing on an accused's likelihood of future dangerousness could be presented to a jury charged with deciding whether the defendant's situation met the standards for the imposition of capital punishment, but was not required. If "psychiatry

and psychology are so particularly related to determinations of dangerousness that these specialists must be involved in the decision-making process," as Respondent urges, then it would seem apparent that the Supreme Court would have had a serious problem where a defendant's life hinged on the determination of future dangerousness, but no expert opinion was presented regarding that issue. The Supreme Court had no such problem in *Barefoot*. Further, the Supreme Court found on other occasions that expert psychiatric or psychological testimony is often too subjective or inconclusive to be a required basis of such determinations. *See Addington v. Texas*, 441 U.S. 418, 430, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) ("The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations. The reasonable-doubt standard of criminal law functions in its realm because there the standard is addressed to specific, knowable facts. Psychiatric diagnosis, in contrast, is to a large extent based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician. This process often makes it very difficult for the expert physician to offer definite conclusions about any particular point."). Thus, we are unwilling to interject a mandatory expert medical testimony requirement in every release eligibility proceeding under § 3–119 of the Criminal Procedure Article. While it is highly likely that the Department, in virtually every case, will adduce expert medical testimony, and that many committed persons will as well, whether the absence of that testimony would be fatal to a particular party's position as a matter of law will depend on the particular contested issues in each case.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY; COSTS IN THE COURT OF SPECIAL APPEALS AND THIS COURT TO BE PAID BY RESPONDENT.**