*State of Maryland v. Lionel Lee Prince*, No. 1024, September Term, 2024. Opinion by Nazarian, J.

**APPELLATE REVIEW – STANDARD OF REVIEW – FINDINGS OF FACT – INEFFECTIVE ASSISTANCE OF COUNSEL**

The postconviction court made no factual findings as to the reasonableness of trial counsel's decision not to object to certain cell site data testimony offered by a lay witness and instead based its holding that trial counsel's performance was deficient on the legal conclusion that the cell site data testimony was inadmissible, unqualified expert testimony. Because the relevant facts were undisputed, this Court was empowered to make its own reasonableness finding on review of the postconviction court's ruling.

**POSTCONVICTION RELIEF – INEFFECTIVE ASSISTANCE OF COUNSEL – DEFICIENT PERFORMANCE – REASONABLENESS**

Trial counsel did not render deficient performance when they decided not to object to admissible lay testimony.

**EVIDENCE – EXPERT TESTIMONY**

A detective's lay testimony about the location of the cell towers with which the defendant's cell phone communicated in the hours surrounding the robbery for which he was charged was not inadmissible, unqualified expert testimony under Maryland Rule 5-701 and Maryland Rule 5-702. Because the detective simply read the street addresses of the cell towers as they appeared in the call detail records provided to law enforcement by T-Mobile, his testimony did not require specialized knowledge or training beyond the understanding of the average juror.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1024

September Term, 2024

_____

STATE OF MARYLAND

v.

LIONEL LEE PRINCE

_____

Nazarian,
Kehoe, S.
Raker, Irma S.,
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: April 7, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In the early morning hours of September 11, 2016, two men robbed a Howard County gas station at gunpoint. Using video footage from the gas station's surveillance camera and fingerprint evidence recovered at the scene, police identified James Brown as a suspect in their investigation. Mr. Brown's cell phone records led police to a second suspect: Lionel Lee Prince. At Mr. Prince's trial, the detective who reviewed Mr. Prince's and Mr. Brown's cell phone records testified, without being qualified as an expert, about the locations of the cell towers with which both men's phones communicated at various times before and after the robbery. Mr. Prince's trial counsel didn't object to the entirety of the detective's cell site data testimony but objected successfully when the detective attempted to interpret what that data indicated about the men's proximity to one another before the robbery and their directions of travel after the robbery. After a jury convicted Mr. Prince of several crimes in connection with the robbery, he filed a petition for postconviction relief on the ground that the entirety of the detective's cell site data testimony was improper lay opinion testimony and that trial counsel provided ineffective assistance by objecting only to parts of it. The postconviction court agreed and granted Mr. Prince a new trial. On appeal, the State argues that trial counsel's decision not to object to the entirety of the detective's cell site data testimony wasn't ineffective assistance and that the postconviction court erred in granting Mr. Prince a new trial. We agree and reverse.

## I. BACKGROUND

### A. The Investigation

At 4:15 a.m. on September 11, 2016, two men robbed a BP gas station on Washington Boulevard in Howard County at gunpoint. A video surveillance camera

located inside the gas station captured footage of the incident. When Detective Christian Kim of the Howard County Police Department ("HCPD") arrived on the scene after being assigned to investigate the robbery, he reviewed the footage and saw that the perpetrators, neither of whom was wearing gloves, had touched various items and surfaces in the store with their bare hands. Detective Kim directed a crime scene technician to process those surfaces for fingerprints, and latent prints lifted from the gas station's exterior door handle led to the identification of a suspect: Mr. Brown.

Once police had identified Mr. Brown, Detective Kim asked Detective Chad Zirk, a member of the HCPD's Repeat Offender Parole Enforcement ("ROPE") Section, to investigate him. He asked Detective Zirk and his unit to conduct physical and electronic surveillance of Mr. Brown and attempt to identify any associates of his who might have been involved in the robbery. As part of his investigation, Detective Zirk uncovered a phone number associated with Mr. Brown. He then obtained a court order that allowed him to acquire the certified call detail records, including cell site data, for that phone number from Mr. Brown's cellular carrier, T-Mobile. After T-Mobile sent over the records, Detective Zirk forwarded them to Detective Kim for analysis.

While reviewing Mr. Brown's call detail records, which contained information on any calls made from or received by Mr. Brown's cell phone number, Detective Kim noticed one number that Mr. Brown's cell phone had communicated with on multiple occasions, including just hours after the robbery. HCPD officers identified that phone number as belonging to Mr. Prince. Detective Kim then sought and obtained the call detail records and cell site data for Mr. Prince's cell phone. Based on the call detail records and other

2

evidence obtained by police over the course of their investigation, the State charged Mr. Prince with several crimes in connection with the robbery. A commissioner of the District Court of Maryland for Howard County issued a warrant for his arrest.

### B.      Detective Kim's Testimony

At Mr. Prince's trial,[1] Detective Kim testified as a lay witness about the cell site data contained in Mr. Brown's and Mr. Prince's call detail records. He defined cell site data as "the cell [phone's] communication with cell towers which gives [police the] approximate location of the cell phone device that's communicating with the tower." He stated that after Detective Zirk sent him Mr. Brown's and Mr. Prince's call detail records, he "decided to review and analyze" the cell site data for both phones to determine their locations at various times from the evening of September 10, 2016 until the morning of September 11. Detective Kim explained that from his review, both phones operated from a cell tower in Baltimore City between 9:00 p.m. and 10:00 p.m. on September 10. Then, at approximately 11:20 p.m., both phones operated from the same cell tower in Laurel. Detective Kim could have learned this information simply from reading the T-Mobile call detail records, which were in spreadsheet form and included the street address, city, state, and zip code of the cell tower that each phone operated from each time the user made or received a call or text message. The State offered Mr. Brown's and Mr. Prince's call detail records, which included this cell site data, into evidence, and the court admitted them.

---

[1] Mr. Prince was tried twice in connection with the September 11, 2016 robbery. His first trial, in 2017, ended with a hung jury. The trial at issue here was his second, which took place on February 13 and 14, 2018.

3

Detective Kim *next* attempted to give his interpretation of the data, explaining that the fact that both phones operated from the same tower in Laurel at the same time "tells me that [they were] likely within close proximity . . . to each other." However, Mr. Prince's counsel objected, and the court sustained the objection to Detective Kim's interpretation and struck that part of his testimony.

Moving on, Detective Kim testified that Mr. Prince's cell phone continued to operate from the tower in Laurel until 12:47 a.m. on September 11, and that Mr. Brown's phone continued to operate from that tower until 3:17 a.m. After the time of the robbery, between 5:10 a.m. and 5:20 a.m., Mr. Brown's cell phone operated from a cell tower in Ellicott City in Howard County, and Mr. Prince's phone began operating from a cell tower in Baltimore County around Route 70 and Route 695 at around 7:30 a.m. Detective Kim began to explain that "what [that] tells me was . . . after the robbery both cell devices are traveling north past Howard County towards the direction of Baltimore City . . . ." Mr. Prince's counsel objected again; the court sustained the objection again, and it struck Detective Kim's testimony to the extent that it involved his interpretation of the cell site data and the direction the parties' cell phones were traveling after the time of the robbery. The court then gave the jury the following instruction about the stricken testimony:

> THE COURT: Alright, ladies and gentlemen, this witness can properly tell you about which tower which phone was pinging off of; and that's what we're talking about is pinging at what time; however I'm striking any testimony of his interpretation of what direction cars were traveling or individuals were traveling. You can take that pinging information and do with it what you will in your interpretation as what will guide you absent further evidence to be presented, if any further evidence is presented on that particular topi[c]. So, the interpretation as

4

it relates to traveling is stricken but the testimony as to pinging, the dates, the times and the tower locations is not stricken, you can consider that, alright?

To illustrate the effect of Mr. Prince's counsel's objections and the court's curative instruction, we reproduce the relevant portion of Detective Kim's testimony below with the stricken statements struck through. The unstruck portions are what the court's rulings left for the jury to consider:

> [COUNSEL FOR THE STATE]: And with that information that Detective Zirk provided to you what did you do?
>
> [DETECTIVE KIM]: I decided to review and analyze both cell site data or location that they have for both devices which I was able to obtain through Detective Zirk. And what I noted and I thought to be pretty significant was that on September 10th between 9:00 p.m. to 10:00 p.m. both devices operated from a cell tower that was located within the confines of Baltimore City. . . .
>
> * * *
>
> [DETECTIVE KIM]: And approximately 11:20 p.m. on September 10th both devices operate from a same cell tower located at 3601 Laurel Fort Meade Road in Laurel, Maryland. ~~That tells me that at that same time both devices are communicating with the same tower which tells me that they're likely within close proximity~~ —
>
> [COUNSEL FOR MR. PRINCE]: Objection.
>
> [DETECTIVE KIM]: ~~— to each other~~ —
>
> THE COURT: Sustained, as to his interpretation, I'll strike that.
>
> [DETECTIVE KIM]: -- and at approximately 12:47 a.m. on September 11th Mr. Prince's cell phone device continues to communicate with that same tower up until 12:47 a.m. in the morning.

5

With respect to Mr. Brown, his cell device communicates with that same tower located at 3601 Laurel Fort Meade Road up until 3:17 a.m. in the morning.

From there at approximately 7:30 a.m. in the morning Mr. Prince's cell device is communicating from a cell tower that's located in Baltimore County around Route 70 and Route 695.

And Mr. Brown's cell device communicates with a cell tower located in Ellicott City, Howard County, Maryland at approximately five, I wanna say between 5:10 and 5:20 a.m. on September the 11th.

~~So, what that tells me was both devices are communicating with a tower south of Howard County and after there is after the robbery both cell devices are traveling north past Howard County towards the direction of Baltimore City not to[o] soon after the armed robbery.~~

[COUNSEL FOR MR. PRINCE]: Objection --

In summary, based on Mr. Prince's counsel's objections, the court allowed the jury to consider Detective Kim's testimony about the physical locations of the cell towers with which Mr. Brown's and Mr. Prince's phones were communicating around the time of the robbery (information that both Detective Kim and the jury could have ascertained from reading the T-Mobile call detail records that were in evidence), but didn't allow the jury to consider his testimony about Mr. Brown's and Mr. Prince's proximity to each other or their direction of travel in the hours before and after the robbery (information Detective Kim could only have obtained through his own analysis and interpretation of the T-Mobile cell site data).

## C.     The Postconviction Hearing

At the close of trial, the jury found Mr. Prince guilty of assault in the first degree; conspiracy to commit robbery with a dangerous weapon; robbery with a dangerous

6

weapon; and firearm possession with a disqualifying conviction; and found him not guilty of firearm use during a felony or crime of violence. Mr. Prince noted an unsuccessful appeal from his convictions, *Prince v. State*, No. 860, Sept. Term 2018 (Md. App. June 2, 2020), and in September 2021, he filed a *pro se* petition for postconviction relief. The court scheduled a postconviction hearing for April 2022, and after several agreements to postpone the hearing, Mr. Prince, by then represented by counsel, filed a supplemental petition for postconviction relief in April 2023.

In his supplemental petition, Mr. Prince asked the postconviction court to vacate his convictions and grant him a new trial because his trial counsel had rendered ineffective assistance. Mr. Prince made six allegations of error, only one of which is relevant to the present appeal: Mr. Prince alleged that his trial counsel rendered ineffective assistance by failing to object to the entirety of Detective Kim's cell site data testimony. He argued that Detective Kim's testimony about the location of the cell towers with which Mr. Brown's and Mr. Prince's cell phones were communicating in the hours prior to and following the robbery was improper lay opinion testimony under Maryland Rules 5-701 and 5-702. Because "the use of the [cell site data] records and cell phone towers in 'tracking' Mr. Prince's location on the night of the robbery"; "[m]apping the cell towers"; and Detective Kim's testimony "regarding cell phone technology and specifically the operation of cell phone towers" all required "specialized knowledge, experience, and training," Mr. Prince asserted, it was improper for Detective Kim to testify on these subjects without an expert designation. Thus, Mr. Prince contended, trial counsel's failure to object to the entirety of Detective Kim's testimony on these subjects prejudiced Mr. Prince "in that there is a

7

substantial possibility that the error had an effect on the outcome of the trial."

The court eventually held a postconviction hearing on November 9, 2023. At the hearing, Mr. Prince called his trial counsel to testify as a witness. After establishing that trial counsel recalled trying Mr. Prince's case and that cell site location data was involved, Mr. Prince's postconviction counsel asked his trial counsel if he would agree that "the connection of a cell tower and [Mr. Prince's] phone at a particular time" was a subject about which an expert rather than a layperson would need to testify. Trial counsel responded in the affirmative:

> [POSTCONVICTION COUNSEL]: Okay. So with respect to the connection of a cell tower and your client's phone at a particular time.
>
> [TRIAL COUNSEL]: Uh-huh.
>
> [POSTCONVICTION COUNSEL]: Do you agree that that's something you'd have to be an expert to testify about?
>
> [TRIAL COUNSEL]: Perhaps. Yes.

Postconviction counsel then asked trial counsel if he remembered having a strategic reason to not object to Detective Kim's testimony, and he responded in the negative:

> [POSTCONVICTION COUNSEL]: . . . Do you remember if you had a strategic reason not to object?
>
> [TRIAL COUNSEL]: Other than what I've previously stated, no.
>
> [POSTCONVICTION COUNSEL]: Okay. So there wasn't an advantage to your client to having this information come into evidence?
>
> [TRIAL COUNSEL]: Was there an advantage or that I would view as an advantage for it coming in? No.

8

Later, however, trial counsel testified that although the cell site data placed Mr. Prince in the same location as Mr. Brown before and after the robbery, he may have chosen not to object to the cell site data testimony because the data didn't place Mr. Prince affirmatively in the vicinity of the BP gas station at the time of the robbery:

> [POSTCONVICTION COUNSEL]: . . . [D]id the case have anything to do with your client's association with James Brown?
>
> [TRIAL COUNSEL]: Yes.
>
> * * *
>
> [POSTCONVICTION COUNSEL]: Okay. And so the cell phone record that your client and James Brown's phone were connected to the same cell tower on the day of the robbery helps the State to establish a connection with James Brown. Is that fair to say?
>
> [TRIAL COUNSEL]: Not necessarily.
>
> [POSTCONVICTION COUNSEL]: Ok. So --
>
> [TRIAL COUNSEL]: If I recall the cellphone records did not place Mr. Prince at the location at the time of the incident.
>
> [POSTCONVICTION COUNSEL]: Okay.
>
> [TRIAL COUNSEL]: So that could have been something that may have gone into my thinking at the time.
>
> [POSTCONVICTION COUNSEL]: Okay.
>
> [TRIAL COUNSEL]: I assume that if the records did place him at the location I may have done things differently. But again, I am just trying to remember as much as I can.

Trial counsel admitted, though, that highlighting Mr. Prince's connection to Mr. Brown wouldn't have been advantageous to his case:

[POSTCONVICTION COUNSEL]: Okay. In your strategy for defending Mr. Prince was it your design to highlight the association between James Brown and Mr. Prince?

[TRIAL COUNSEL]: My position was that Mr. Prince was not there when the incident occurred.

[POSTCONVICTION COUNSEL]: Okay. So was there any advantage in your mind to highlighting the connection between Mr. Prince and Mr. Brown?

[TRIAL COUNSEL]: What do you mean highlighting the connection?

[POSTCONVICTION COUNSEL]: Showing the jury evidence that led to a conclusion that James Brown and Mr. Prince were together on September 10, 201[6].

[TRIAL COUNSEL]: No. That would be a disadvantage.

[POSTCONVICTION COUNSEL]: Okay.

[TRIAL COUNSEL]: I mean, that wouldn't be my -- it wouldn't be my purpose to place the two of them together --

[POSTCONVICTION COUNSEL]: Okay.

[TRIAL COUNSEL]: -- in defending him.

In a Memorandum Opinion entered April 16, 2024, the postconviction court ruled that Mr. Prince's trial counsel rendered ineffective assistance by failing to object to the entirety of Detective Kim's cell site data testimony. The postconviction court noted that although trial counsel objected to the cell site data testimony "insomuch as Detective Kim injected his own opinion as to what the cell phone tower data meant," he "never objected to Detective Kim's testimony in general, in which he relied on cell phone tower data to describe [Mr. Prince's] location." Relying on this Court's opinions in *Wilder v. State*, 191 Md. App. 319 (2010), and *Coleman-Fuller v. State*, 192 Md. App. 577 (2010), and the

10

Supreme Court of Maryland's opinion in *State v. Payne*, 440 Md. 680 (2014), the postconviction court stated that "Maryland courts have made clear that testimony regarding cell phone tower data, including call detail records, must be given by qualified experts," which Detective Kim wasn't. Accordingly, the court determined that "[t]rial counsel was ineffective in his failure to object to Detective Kim's entire testimony as unqualified expert testimony because it was inadmissible" and found that this failure prejudiced Mr. Prince.

Based on its ruling, the court granted Mr. Prince's petition for postconviction relief and gave him thirty days to file a motion for new trial. Mr. Prince filed a motion for new trial within the thirty days, and the court granted the motion. The State filed a timely application for leave to appeal the postconviction court's ruling, which this Court granted.

## DISCUSSION

The State presents one question for our review, which we rephrase: Did the postconviction court err in granting Mr. Prince a new trial based on ineffective assistance of counsel?[2] We hold that it did.

---

[2] The State phrased the Question Presented in its brief as follows:

> Did the postconviction court err in granting Prince postconviction relief on the ground that he received ineffective assistance of counsel when his trial attorney chose not to object to a detective's lay testimony about the location of Prince's cell phone on the night of the robbery?

Mr. Prince phrased his Question Presented in the following manner:

> Whether the post-conviction court correctly found counsel's failure to object to a lay witness's testimony on cell site data was ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984).

11

As a threshold matter, the parties disagree about the proper standard of review. On one hand, the State offers a single standard. Specifically, the State argues that the "ultimate question for this Court to consider" is whether the postconviction court correctly determined that "[Mr. Prince's] trial counsel acted objectively reasonably," a legal determination that we must consider *de novo*. On the other hand, Mr. Prince asserts that "[t]his appeal involves three issues, each with its own standard of review." *First*, he asks us to apply an abuse of discretion standard when reviewing the postconviction court's conclusion that Detective Kim's lay testimony on cell site data was inadmissible. *Second*, he asserts that the postconviction court made a factual finding that trial counsel's failure to object to Detective Kim's testimony wasn't strategic, and that we should review that finding for clear error. *Third and finally*, Mr. Prince states, we review the postconviction court's ultimate determination that he received ineffective assistance of counsel for legal correctness—that is, *de novo*.

There are elements of truth in the contentions of both parties. To bring a successful claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), a criminal defendant must prove two things. *First*, they "must show that counsel's performance was deficient." *Id.* at 687. Put differently, they must prove that "counsel made errors so serious" that they failed to "function[] as the 'counsel' guaranteed" by the Sixth Amendment. *Id. Second*, the defendant "must show that the deficient performance prejudiced the defense" such "that counsel's errors were so serious as to deprive the defendant of a fair trial." *Id.* In other words, they must prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

12

have been different." *Id.* at 694.

The deficient performance prong of the *Strickland* test breaks down further into two components. "To show a deficiency, [the defendant] must (1) demonstrate that counsel's acts or omissions, given the circumstances, 'fell below an objective standard of reasonableness considering prevailing professional norms,' and (2) overcome the presumption that the challenged conduct 'be considered sound trial strategy.'" *Wiggins v. State*, 352 Md. 580, 602 (1999) (internal citations omitted) (*quoting Oken v. State*, 343 Md. 256, 283 (1996)).

We review a postconviction court's rulings as to ineffective assistance of counsel "as a mixed question of law and fact." *Blake v. State*, 485 Md. 265, 290–91 (2023). That is, we review the court's legal conclusions—including, in the present case, whether Detective Kim's testimony was admissible without an expert designation—*de novo*, and we review its factual findings for clear error. *Id.* at 291. As the State points out, the court's ultimate determinations as to whether trial counsel performed deficiently and, if so, whether counsel's deficient performance prejudiced defendant are legal conclusions subject to this Court's "'own independent analysis.'" *Id.* (*quoting Oken*, 343 Md. at 284–85). But as Mr. Prince asserts correctly, the postconviction court can make factual findings as to each of the sub-questions under the deficient performance prong (*i.e.*, whether counsel's actions were objectively reasonable and whether they were the product of sound trial strategy), and we review those for clear error. *See Perry v. State*, 357 Md. 37, 78–79 (1999) (noting that the postconviction court "found as a fact" that counsel's actions were "not a matter of trial strategy or tactics" but "made no finding as to whether the deficiency

13

fell below an objective standard of reasonableness").

Based on our reading of the postconviction court's Memorandum Opinion, the court made no factual findings as to either deficient performance sub-prong. The court did acknowledge that "[a]t the post-conviction hearing, trial counsel testified that he did not recall a strategic reason to not object to Detective Kim's testimony." But this acknowledgment didn't amount to a conclusive finding that as a matter of fact, trial counsel's decision not to object wasn't the product of sound trial strategy. Likewise, the postconviction court made no factual finding about whether trial counsel's conduct was reasonable "considering prevailing professional norms." *See Wiggins*, 352 Md. at 602. Instead, the court based its ruling that "[t]rial counsel was ineffective in his failure to object to Detective Kim's entire testimony as unqualified expert testimony" on its legal conclusion that the entirety of Det. Kim's testimony "was inadmissible."

In *Coleman v. State*, 434 Md. 320 (2013), the Supreme Court of Maryland was confronted with a similar situation. At Mr. Coleman's postconviction hearing, he argued, among other grounds, that his trial counsel was ineffective because counsel failed to object to multiple references by the State to his silence after he received *Miranda* warnings. *Id.* at 327–28. Because the postconviction court found that Mr. Coleman had waived this ineffective assistance claim by not raising it at trial or on appeal, it didn't make any factual findings as to whether trial counsel's performance was objectively reasonable or whether trial counsel's actions could be considered sound trial strategy. *Id.* at 329. On appeal, the State argued that the Supreme Court should remand the case for the postconviction court to make a factual determination on reasonableness. *Id.* at 335. The Court found remand

14

unnecessary, however, because the underlying facts of the case—that trial counsel hadn't objected to the State's references to Mr. Coleman's post-*Miranda* silence and that counsel had admitted at the postconviction hearing "that he was unaware that a defendant could invoke his right to remain silent on a question-by-question basis"—weren't in dispute. *Id.* at 335, 337. Based on these uncontroverted facts, the Court reached its own conclusion that trial counsel's failure to object was an "obvious error" and that "a reasonably competent attorney . . . would have raised an objection." *Id.* at 338.

Here, it is undisputed that Mr. Prince's trial counsel didn't object to the entirety of Detective Kim's cell site data testimony but did object—successfully—when Detective Kim attempted to give his interpretation of the data. It is undisputed as well that at the postconviction hearing, Mr. Prince's trial counsel agreed that "the connection of a cell tower and [Mr. Prince's] phone at a particular time" was a subject that would "[p]erhaps" require expert testimony. As we explain below, though, the parts of Detective Kim's testimony to which Mr. Prince's trial counsel didn't object *were* admissible lay testimony. So unlike trial counsel's admitted failure to object to testimony about Mr. Coleman's post-*Miranda* silence in *Coleman*, based on the uncontested facts of the present case, Mr. Prince's trial counsel's failure to object to the entirety of Detective Kim's cell site data testimony wasn't "obvious error." 434 Md. at 338. So we need not decide if trial counsel's actions were the product of sound trial strategy or if they somehow prejudiced Mr. Prince because trial counsel's conduct was reasonable "considering prevailing professional norms," and thus, his performance wasn't deficient. *See Wiggins*, 352 Md. at 602.

As *Coleman* reveals, counsel's failure to object to opposing testimony can be

unreasonable if it involves some obvious legal error. 434 Md. at 338 (noting that the law is "clear that admitted evidence of post-arrest silence violates due process of law" and finding accordingly that "the failure to object to the State's numerous references to [Mr.] Coleman's silence is an obvious error . . . and a reasonably competent attorney . . . would have raised an objection" (*quoting Alston v. Garrison*, 720 F.2d 812, 817 (4th Cir. 1983))). But because a failure to object to admissible testimony wouldn't be erroneous at all, *that* failure to object wouldn't be unreasonable and thus wouldn't be ineffective assistance. *See, e.g.*, *State v. Colvin*, 314 Md. 1, 20–21 (1988) (decision not to object to admissible testimony wasn't ineffective assistance because "[h]ad [counsel] made any objection, it should not have been sustained"); *Oken*, 343 Md. at 295 (decision not to object to comments made during State's closing argument wasn't ineffective assistance because "neither of the prosecutor's statements were improper, nor did they violate [Mr. Oken's] right to a fair trial"); *State v. Purvey*, 129 Md. App. 1, 24–25 (1999) (decision not to object to "constitutionally permissible" remarks by the State during closing argument was "objectively reasonable").

In its Memorandum Opinion, the postconviction court stated that "Maryland courts have made clear that testimony regarding cell phone tower data, including call detail records, must be given by qualified experts" and that because "Detective Kim was never qualified as an expert," his cell site data testimony was inadmissible. From there, the court held that "[t]rial counsel was ineffective in his failure to object to Detective Kim's entire testimony as unqualified expert testimony because it was inadmissible."

The State disagrees. It argues that "Detective Kim's testimony was not clearly

16

objectionable" under Maryland's case law because the records on which he relied "explicitly provided the address of each cell tower," meaning he didn't need to "parse the pertinent information from the impertinent data in the records"; "transform the data"; "extrapolate from the data"; or "glean for himself the geographic location of each cell tower." Consequently, the State asserts, his testimony didn't require specialized knowledge or training beyond the understanding of the average juror, and "[Mr.] Prince's trial counsel acted reasonably by choosing not to object to it." Conversely, Mr. Prince contends that the postconviction court's ruling was correct. He argues that Detective Kim's cell site data testimony was unqualified expert testimony because "[Detective] Kim, a lay witness, used raw data identifying cell towers Mr. Prince's and Brown's phones 'pinged' before and after the robbery, and used that data to tell the jurors the phones' locations."

The State is right. Maryland Rules 5-701 and 5-702 govern the admissibility at trial of lay opinion testimony and expert testimony, respectively. Rule 5-701 limits lay opinion testimony to opinions or inferences that are rationally based on the witness's perception. Md. Rule 5-701(1). Rule 5-702 permits the use of expert testimony by a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" if the trial court "determines that the testimony will assist the trier of fact to understand the evidence or determine a fact in issue." Md. Rule 5-702(1). Together, these rules "prohibit the admission as 'lay opinion' of testimony based upon specialized knowledge, skill, experience, training or education." *Ragland v. State*, 385 Md. 706, 725 (2005). Consequently, while expert testimony "'is not required on matters of which the jurors would be aware by virtue of common knowledge,'" it *is* required "'when the subject of the

17

inference . . . is so particularly related to some science or profession that is beyond the ken of the average layman.'" *Johnson v. State*, 457 Md. 513, 530 (2018) (*quoting Bean v. Dep't of Health & Mental Hygiene*, 406 Md. 419, 432 (2008)); *State v. Galicia*, 479 Md. 341, 389 (2022).

This Court and the Supreme Court have held that cell site data testimony must be given by a qualified expert if the testimony involves some interpretation of the data that falls beyond the knowledge or experience of the average juror. *See Wilder v. State*, 191 Md. App 319, 368 (2010) (lay testimony by officer who used a computer program to "elaborate[]" on cell phone bills and call records to plot the location data from Mr. Wilder's cell phone records on a map "in order to plot the locations from which [Mr.] Wilder used his cell phone" was inadmissible because the procedure the officer used "clearly required 'some specialized knowledge or skill . . . not in the possession of the jurors'" (*quoting Ragland*, 385 Md. at 720)); *Coleman-Fuller v. State*, 192 Md. App. 577, 619 (2010) (trial court erred by admitting without expert qualification the testimony of an officer who, based on specialized training from the cell phone company, "utilize[ed] the data from [Mr. Coleman-Fuller's] cell phone records [and] . . . rendered an opinion . . . that the phone records were consistent with [his] presence in the vicinity of the murder around the time it happened"); *State v. Payne*, 440 Md. 680, 685–86, 701–02 (2014) (detective who parsed thousands of pages of cell phone records in a single exhibit and relied on his training, knowledge, and experience to take raw data and "determine[d] the location of the cell towers through which [the defendants'] cell phone[s] connected on the night of the murder and their location relative to the crime scene" needed to be qualified as an expert to testify

about his analysis).

By contrast, however, in *Johnson v. State*, 457 Md. 513 (2018), the Supreme Court held that testimony by an officer who "literally read[]" entries from a GPS report was admissible lay testimony that didn't require a qualified expert. *Id.* at 535. Mr. Johnson, a Maryland Transit Authority ("MTA") police officer, was charged and convicted for assaulting a young woman who was involved in a traffic accident with an MTA bus. *Id.* at 517. For safety reasons, MTA officers carried GPS tracking devices called "Pocket Cops." *Id.* at 521. The officers' supervisors could access the Pocket Cop GPS data using a computer program called "Field Force Manager" that "generate[d] a report that show[ed] the location of a Pocket Cop at specific times and the duration of time spent at each location." *Id.* At Mr. Johnson's trial, an MTA police supervisor, reading a report generated from Force Field Manager, testified that the GPS data from Mr. Johnson's Pocket Cop device showed that he was in the vicinity of the victim's residence at the time of the alleged assault. *Id.* at 521, 535.

The Supreme Court held that the supervisor's lay testimony was admissible. *Johnson*, 457 Md. at 537. It acknowledged *first* that "[a]lthough a user may not understand precisely how a GPS device works . . . [t]he general public has a common sense understanding of what information the device conveys" because the public "relies on GPS devices" for navigation. *Id.* at 531. Because, in its opinion, the average juror could understand the information provided by a GPS device, the Court decided that "the times and locations reflected in GPS data in a business record do not necessarily require expert testimony to be admissible." *Id.* at 532.

The Court then contrasted the supervisor's testimony in the case with the cell tower location testimony given by the detective in *Payne*. *Johnson*, 457 Md. at 533–36. In *Payne*, the Court noted, the defendants' cell phone records didn't include their exact locations at the time they placed a call and "were 'not decipherable' based on common experience." *Id.* at 534 (*quoting Payne*, 440 Md. at 701). Rather, the testifying detective "had to rely on 'knowledge, skill, experience, training or education'" to decipher the "'string of data'" provided in the records and "to hone in on the pertinent entries and eliminate the extraneous data." *Id.* In summary, the detective in *Payne* "was not simply reciting information from the business records, but applying specialized knowledge to translate the voluminous records into something the jury could understand." *Id.* Conversely, in the case before the Court, the supervisor who testified about the GPS data at Mr. Johnson's trial "*was literally reading* the entries as they appeared in the [Field Force Manager] report." *Id.* at 535 (emphasis added). The entries in the report, the Court explained, were "decipherable without specialized knowledge" and weren't "beyond the ken of the average juror" because they listed "street addresses and times written in plain language." *Id.*

Although Mr. Prince's case involves cell site data records rather than GPS records, Detective Kim's testimony shared more similarities with the GPS data testimony in *Johnson* than it did with the cell site data testimony in *Wilder*, *Coleman-Fuller*, and *Payne*. "[C]ellular telephone technology has become generally understood." *Wilder*, 191 Md. at 367. Though the average juror would be unable to, say, decipher a string of raw cell site data to determine which cell tower a user's phone was operating from at a particular time, *see Payne*, 440 Md. at 701, members of the general public, "'by virtue of common

20

knowledge,'" understand the general purpose and function of cell towers just as they do the purpose and function of GPS devices. *Johnson*, 457 Md. at 530–31 (*quoting Bean*, 406 Md. at 432). The average juror would also be able to comprehend without specialized knowledge, education, or training the idea that cell phones communicate with cell towers and that cell site data "gives [police the] approximate location of the cell phone device that's communicating with the tower."

Further, like the MTA police supervisor in *Johnson* who "literally read[]" Mr. Johnson's Pocket cop GPS data for the jury, 457 Md. at 535, Detective Kim recited the locations of the cell towers that Mr. Prince's and Mr. Brown's cell phones operated from at various times before and after the robbery as they appeared in the call detail records. The T-Mobile call detail records, like the Field Force Manager report in *Johnson*, listed the address of each tower and the times at which Mr. Prince's and Mr. Brown's phones communicated with those towers "in plain language" that the jurors themselves could read and understand easily. *Id.* Thus, unlike in *Wilder*, *Coleman-Fuller*, and *Payne*, Detective Kim didn't need to utilize any special training or knowledge to determine the cell tower locations. He didn't need to use a computer program to plot the location data from Mr. Prince's and Mr. Brown's cell phone records on a map as the testifying officer did in *Wilder*, 191 Md. App at 368, or decipher a "'string of data'" in order "to hone in on the pertinent entries," as in *Payne*. *Johnson*, 457 Md. at 534 (*quoting Payne*, 440 Md. at 701). And when he attempted to interpret what the call detail records told him about Mr. Prince's and Mr. Brown's proximity to one another before the robbery and their directions of travel after the robbery, opinions similar to the lay opinion this Court found to be improper in

21

*Coleman-Fuller*, 192 Md. App. at 619, trial counsel objected successfully and got those parts of the testimony stricken.

The postconviction court's determination that the entirety of Detective Kim's cell site data testimony was inadmissible was incorrect legally. Because the parts of that testimony to which trial counsel didn't object were admissible, he didn't commit any "obvious error" by deciding not to object to them, *see Coleman*, 434 Md. at 338, and his decision not to object was reasonable "considering prevailing professional norms." *See Wiggins*, 352 Md. at 602. So without needing to decide if the decision not to object was strategic, *see id.*, we hold that Mr. Prince failed to meet his burden to prove that trial counsel's performance was deficient, and thus failed to prove that trial counsel provided ineffective assistance. *See Strickland*, 466 U.S. at 687 (noting that a criminal defendant must show both deficient performance and prejudice to prove ineffective assistance of counsel). And because the postconviction court erred in granting Mr. Prince a new trial based on ineffective assistance of counsel, we reverse.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY REVERSED. APPELLEE TO PAY COSTS.**